UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
EDWARD WONG and KEREN (ALFRED) ZHOU,

        *Plaintiffs*,                                             19 CV 3731

        *v.*                                                     COMPLAINT

WILMINGTON CAPITAL SECURITIES, LLC,
JOHN GRIFFIN, and RONALD DORUSHKIN,

        *Defendants.*
------------------------------------------------------------------------x

      Plaintiffs Edward Wong and Keren (Alfred) Zhou, by their counsel, Young & Ma LLP, allege for their Complaint against Defendants Wilmington Capital Securities, LLC, John Griffin and Ronald Dorushkin, as follows:

PRELIMINARY STATEMENT

      1.     Plaintiffs Edward Wong ("Eddie") and Keren Zhou ("Alfred") seek damages and costs against Defendants Wilmington Capital Securities, LLC ("Wilmington") for discriminating against them based on race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*.

      2.     Plaintiffs also seek damages and costs against Defendants Wilmington Capital Securities, LLC, John Griffin ("John") and Ronald Dorushkin ("Dorushkin") for discriminating against them and terminating them based on race in violation of § 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981.

      3.     Plaintiffs also seek damages and costs against Defendants Wilmington Capital Securities, LLC, John Griffin and Ronald Dorushkin for discriminating against them based on their race by, among other things, subjecting Plaintiffs to a hostile work environment and ultimately terminating their employment, in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq*.

1

## JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES

4. Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiffs' claims arising under Title VII and Section 1981.

5. Pursuant to 28 U.S.C. § 1332, this Court has supplemental jurisdiction over Plaintiffs' NYSHRL and NYCHRL claims, as these claims are so related to the claims within such original jurisdiction that they form part of the same case or controversy.

6. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

7. All conditions precedent to maintaining this action have been fulfilled. A charge of discrimination was filed with the Equal Employment Opportunity Commission (EEOC) by both Plaintiffs. The EEOC issued a Right-to-Sue letter dated January 30, 2019 for both Plaintiff Eddie and Plaintiff Alfred, relating to the discriminatory and retaliatory acts described in this Complaint. This action was properly instituted for each Plaintiff within 90 days of the issuance of the Right-to-Sue letters.

## TRIAL BY JURY

8. Plaintiffs respectfully request a trial before a jury.

## PARTIES

9. Plaintiff Eddie, at all times relevant hereto, was and is a resident of Queens County in the State of New York.

10. Plaintiff Alfred, at all times relevant hereto, was and is a resident of Hudson County in the State of New Jersey.

11. Upon information and belief, at all times relevant hereto, Defendant Wilmington Capital Securities, LLC was and is a domestic limited liability company organized under the laws of the State of New York with a place of business located at 1180 Avenue of the Americas, New York, NY 10036. Wilmington is a broker-dealer with more than 15 employees in Long Island and New York City. Plaintiffs worked in the New York City office.

12.     Upon information and belief, Defendant Ronald Dorushkin resides in the State of New York and is the CEO of Wilmington at 1180 Avenue of the Americas, New York, NY 10036.

13.     Upon information and belief, Defendant John Griffin resides in the State of New York and is a financial advisor of Wilmington at 1180 Avenue of the Americas, New York, NY 10036.

## STATEMENT OF FACTS

### Plaintiff Edward Wong

14.     Eddie is a 41-year-old Asian-American man.

15.     Eddie is a registered representative, specializing in trading equity and equity derivatives as well as alternative investments.

16.     Eddie has 18 years of trading experience and is Series 7 and 63 licensed.

17.     Eddie worked for Wilmington and its related company and its proprietors for 5 years from July 2013 to June 2018.

18.     Eddie came to Wilmington with over 10 years of experience as a proprietary and equity sales trader having worked in the RBC Professional Trader Group and with Genesis Security and Legend Securities Inc.  Prior to transitioning to Wilmington, Eddie worked as a registered representative for its related company Forefront Wealth Management.

19.     Eddie has a bachelor's of science in Management and Policy and Business Management from SUNY Stony Brook. He was on the Dean's List and Golden Key National Honor Society there.

20.     Eddie is proficient in Mandarin and Cantonese Chinese.

21.     At Wilmington, Eddie actively managed accounts for individuals and family offices, customized investment approaches for individual needs, created trading strategies based on different market conditions, actively created market trading strategies to target client groups to raise new capital, performed extensive market research to ensure quality of trades and actively

engaged with new investment platforms to find alternative investment ideas. Eddie was last employed as a Senior Vice President.

22.     A year before Eddie's termination, he took on his first trainee, Alfred Zhou, to go in a different profitable direction where in the six months before Eddie's termination, they generated over $400,000 for Defendants. Many accounts previously on margin calls (deficient) were outperforming the market before Eddie got a lot of push back on his work. Unfortunately, a new manager, Defendant John Griffin, discriminated against Eddie and Alfred as two Chinese male professionals. Eddie's more supportive and substantively experienced supervisor, Michael Halperin, resigned in March 2018.

23.     Defendant John took over the New York City branch where Eddie worked shortly after Michael Halperin resigned in March 2018. Eddie was immediately excluded at this time.

24.     Defendant John scheduled a company dinner to integrate into the company and disclose his new approach. The only two people not invited to the dinner were Plaintiffs (the two Chinese guys).

25.     After this dinner, the CEO and Defendant Ronald Dorushkin contacted Eddie, going over his accounts and transition as if he were leaving the Company. Defendant John told Defendant Ron at the dinner that Eddie would be leaving or that he did not want Eddie on the team. Eddie was completely shocked and offended that the CEO automatically assumed he had no role at the company unless a more senior White manager could vouch for him because he was very profitable and his strategies were very good.

26.     Eddie then told Defendant Dorushkin that he intended to stay registered with Wilmington although Defendant Dorushkin suggested that Eddie had to interview again and potentially work in the Garden City office (although Eddie had worked his entire career in New York City) with a pay cut. He made offensive references about another prior Chinese registered representative at the company named Shi Zhou who Wilmington put under investigation for her trading practices. There is absolutely no connection between Eddie and Shi Zhou except that both are Chinese.

27. Defendant John had virtually no trading experience and worked as an investment advisor. He was Series 24 licensed like Eddie's previous supervisor Michael and therefore could be in charge of the branch. Michael was much more experienced than Defendant John in the type of trading Eddie does. However, to appease Eddie's superiors who had less experience in the trades he covered, he showed Defendant John the potential income for the branch with his accounts. Ultimately, Defendants accepted the original employment arrangement Eddie had with the company and under his previous supervisor Michael.

28. Almost immediately, Defendant John started to interfere with Eddie's work by surreptitiously asking his subordinate, Alfred, about Eddie's work instead of addressing Eddie directly.

29. Eddie's previous supervisor Michael Halperin understood the benefits and risks of his trades much better. When there were issues with clearing firms, Michael would call them and clear it up due to his experience and which was his responsibility as the Series 24 licensed manager. Defendant John was unable to do this and problems started to arise.

30. Defendant John preferred younger White male employees, like Brian Redican and Mark Jennings. He also liked Derek Park (White male) and gave him a lot more discretion and respect. This is relevant because Derek Park also worked in discretionary trades and was treated completely differently from Plaintiffs.

31. On May 23, 2018 Defendant John and Defendant Dorushkin called Plaintiffs into the office for a call. However, Joseph Columbo (Chairman) and John Mikes (President) were also on the phone with Defendant Dorushkin (CEO) and Defendant John (branch manager). The CCO Dennis Lee had gone on vacation. In a complete act of ignorance and also in a clear act of sabotage to Plaintiffs, Defendant Dorushkin said that the firm does not allow discretionary accounts. However, all the accounts Plaintiffs worked on were discretionary and have been traditionally approved by their previous supervisor Michael Halperin and therefore approved by Wilmington. Derek Park, who is a White employee, also worked on discretionary accounts. Once again, they referenced Shi Zhou even though there is no similarity between her and

5

Plaintiffs besides their race. In this conversation, Eddie asked the CEO/Defendant Dorushkin and Defendant John directly to stop referencing Shi Zhou as it is unnecessary, a poor reference and racist. In a further attempt to find a pretextual reason to criticize Eddie, they asked about whether Eddie had the necessary account documentation to trade in discretionary accounts. Account paperwork including the Limited Trading Authority forms are handled by the back office and approved by compliance and the trading platforms RBC and IB before accounts can be opened. Plaintiff Eddie communicated that he had always complied with the firm's procedures and received proper approvals before trading begins. Eddie indicated that he had written notices from IB and RBC as to what they required and he always followed the appropriate procedures, both at Wilmington and previous places of employment. Eddie has also complied with all the forms required by compliance at Wilmington. Derek Park, a preferred White male trader, also manages most of his accounts with discretion (i.e. he works on discretionary accounts) but never had this level of scrutiny, criticism and attack from the management team or from Defendant John.

32. The next day, Defendant John indicated that Wilmington was instituting a new LTA form for clients to sign and additionally required that Plaintiffs provide a detailed trade log explaining their rationale behind every trade, which was redundant and burdensome work especially because Plaintiffs do not get paid a traditional salary. Defendant John also had access to everyone's real time trades on his system and had the ability to create a custom report for each account. Eddie felt this was not the proper way of reviewing all his trades but merely a way to potentially keep his clients and strategies if Wilmington was going to terminate him (which they did a week later). The suspect motives also became obvious when Defendant Dorushkin on a phone call requested Eddie not to document the trade log in any emails to avoid FINRA review. Defendant Dorushkin questioned Eddie's qualification to create a sophisticated trading strategy when Eddie raised these objections and inquired as to the merit behind the trade log. Defendant Dorushkin again made reference to the Chinese employee Shi Zhou, dismissing based on racial stereotype Eddie's 18 years of industry experience.

33. The trade logs were clearly required to target Plaintiffs. Although Derek Park, a White broker with over 100 discretionary accounts and who frequently arrived to the office at 3-4 pm, was also "asked" to submit a trade log, he was not given any deadlines and still had not submitted any substantial logs at the time of Plaintiffs' termination about a week later.

34. On May 31, 2018, Plaintiffs met with a high profile prospect at 4 pm. Although Defendant John knew where Plaintiffs were, he set up a branch meeting at 4:15 pm in a clear effort to create a conflict for Plaintiffs and refused to excuse Eddie from the meeting (although Eddie's salary is based entirely on commission). Plaintiffs were successful in business development and the prospective client committed a large amount of capital to Plaintiffs' trading strategy. However, Defendants then moved to a different method to pretextually criticize Eddie's performance, based on the issuance of false margin calls. The very next morning, Eddie closed out all the trades in question before he met with Defendant John for a conference call with Defendant Dorushkin.

35. Nevertheless, although the issue was addressed within 24 hours, Defendant John used the margin calls to say Eddie's practices were too risky (without taking any responsibility of his inaction on these accounts as opposed to the prior supervisor Michael). On the conference call, Chairman Joseph Columbo and President John Mikes were also on the phone with Defendant Dorushkin. Again the CCO Dennis Lee was absent. Defendants informed Eddie that he is being forced to resign without a reason except that it was a business decision. He indicated that Eddie could only close trades and not open new accounts. Although Eddie told him this is very prejudicial as he just landed his biggest account and it would not be in the best interest of the customer for him to transition at that moment, they still proceeded with insisting that Eddie must leave the company. Immediately after the call, Eddie was stripped of access to the office, work email and logins to client accounts. Defendant John then requested that Eddie hand in a hard copy of a resignation letter and that an emailed copy would not be accepted. At this point, it was clear to Plaintiffs that Defendants did not want a regulator to see the chain of events.

After Eddie was terminated, his client Eduardo Browne and others called for account updates and no one worked with them. In fact, Defendant John rudely hung up on Eduardo Browne.

36. On June 4, 2018, Eddie called Defendant John for a meeting to hand in his resignation letter after Defendants threatened that his reputation and license may be harmed if he did not. Defendant John told Eddie he could only meet him in the lobby to accept the letter. Feeling completely disrespected and wrongfully incriminated, Eddie emailed the requested resignation letter for a record of the events and to avoid the psychological abuse of being treated as a criminal and/or threat to Defendants by having to meet only downstairs when he had been a valuable part of Wilmington for many years. In the letter, Eddie pointed out the unethical practices of Defendants. In an act of retaliation, Wilmington immediately emailed Eddie that he had been terminated for cause and therefore did not accept his letter of resignation (which was also forced). Additionally, Defendants retaliated by indicating that they would withhold all commissions because of Eddie's legitimate reports concerning the Defendants' trading and investment practices. Subsequently, Defendants reported to FINRA that Eddie had been terminated for unwillingness to comply with firm procedures in retaliation for his written complaint. There was no reason to suspect Eddie's practices at Defendants besides that he had become "too profitable" between November 2017 and May 2018 and that he had produced over $400,000.

37. Wilmington has an entirely White male upper management. The only two Chinese male employees were Plaintiffs Alfred Zhou and Eddie Wong – and both Plaintiffs were let go on the same day. The constant reference and comparison to the Chinese trader Shi Zhou revealed the discriminatory motives. Another Chinese female employee, Maria Fang, had also left the firm because she felt disliked and discriminated against. An African American employee Dana Johnson left because he did not like the hostile environment.

38. The discrimination is very obvious when analyzing management's handling of Chinese employees interchangeably. For instance, Alfred had no prior incidents, no customer complaints, no disciplinary actions and no informal complaints but was also told that he must

submit a resignation letter or be fired on the same day Eddie was terminated. There was no basis to treat Alfred this way except he was Chinese like Eddie.

39. When Eddie requested a remote office, he was denied permission. However a White broker named Stephanie Phillips requested a remote office and was quickly approved.

40. Eddie has excellent reviews as to his professionalism and ethical handling of client funds, such as from Christopher Cacace at SW Financial who worked with him at Legend Securities and from many others.

41. Plaintiff Eddie is owed commission and other wages from Wilmington.

### Plaintiff Keren (Alfred) Zhou

42. Plaintiff Alfred is a 25-year-old Chinese foreign national.

43. Alfred is a graduate of the Master of Science program at Fordham University – Gabelli School of Business with a degree in Global Finance. He graduated with a 3.7 GPA in December 2016. Prior to his masters, he graduated from the Dalian University of Technology in China with a bachelor's in economics.

44. Prior to joining Wilmington, Alfred worked as a commercial banking intern for HSBC in China and an investment banking intern analyst for Alpha Capital Holdings.

45. Alfred is Series 7 and 66 licensed. He is a CFA Level III candidate.

46. Alfred is proficient with Bloomberg, FactSet and SAS.

47. Alfred is a Chinese foreign national and was on a F-1 visa when he worked for Wilmington.

48. Alfred worked for Wilmington from April 2017 to when he was fired (constructively discharged and forced to resign) on June 1, 2018 along with his Chinese male mentor, Eddie.

49. At Wilmington, Alfred actively managed 6 individual accounts mainly with Senior VPs (Plaintiff Eddie and Mark Jennings); conducted research on stock revenue drivers, earnings momentum and dividend history; drafted dividend arbitrage and option trading strategy; widened company exposure to international investors by actively connecting with start-up CEOs

9

and high net worth individuals in China; organized Chinese investors' business visits; assisted with preparation on US investment opportunities; worked on business development on 2 international accounts; worked on business development with new clients through networking events; and maintained existing client relationships through daily phone calls and emails, account set up and reports distribution.

50. At the time Alfred was transferred to a new discriminatory supervisor, Defendant John, in April 2018, his 6 client accounts were all funded and he was performing well. Four were US based and 2 were international accounts.

51. In April 2017, Alfred contacted Mark Jennings at Wilmington for a position.

52. Alfred was invited to an interview where Wilmington indicated that they were looking for a bilingual wealth management associate.

53. Based entirely on his race and national origin, Alfred was assigned to work with Eddie and his supervisor at the time, Michael Halperin. Alfred was hired as a wealth management associate.

54. During the course of his employment, Alfred was on a student F-1 visa and Defendants knew he would be afraid to speak up against discrimination or any other employment violations due to his visa status and because he is a foreign national and minority.

55. Due to Eddie's positive mentorship, Alfred was learning at the Company and passed the CFA Level 2 and Series 7 in June/July of 2017, and the Series 66 in December 2017.

56. Around May 2018, Defendant John took over the New York City branch and became Alfred and Eddie's new boss.

57. Besides Alfred and Eddie, everyone else on the team was White. Wilmington also has an entirely White male upper management.

58. When Defendant John reached agreement to take over the NYC branch, he scheduled a company dinner to meet with Wilmington partners and employees. The only two people not invited to the dinner were Alfred and Eddie (the two Chinese guys). This was very

stressful because Alfred had 6 clients and his future at the Company felt uncertain, which was unfair to Alfred's clients and to Plaintiffs.

59. Sometime after the dinner, Eddie told Alfred he had reached an agreement with the Company for his continued employment, which provided a brief respite to Alfred's worries.

60. However on May 22, 2018, Alfred was called into Defendant John's office about a FINRA form asking about discretionary trading and they called the Company's compliance officer Dennis Lee, who was unsure as to the answer. Eddie had always confided in Alfred how uncomfortable he felt about Wilmington's weak compliance procedures and documentation and its potential inability to protect its employees and clients.

61. On May 23, 2018, Defendant John called Plaintiffs into the office for a call with the CEO. However, Joseph Columbo (Chairman) and John Mikes (President) were also on the phone with Defendant Ronald Dorushkin (CEO) and Defendant John Griffin (Branch Manager). The CCO Dennis Lee had gone on vacation. In a complete act of ignorance and also in a clear act of sabotage to Plaintiffs, Defendant Dorushkin said that the firm does not allow discretionary accounts. However, all the accounts Plaintiffs worked on were discretionary and have been traditionally approved by their previous supervisor Michael Halperin. Derek Park, who is a White employee, also worked on discretionary accounts. Then out of nowhere, Defendant Dorushkin made a reference to another Chinese female employee, Shi Zhou, and how her accounts caused problems for the company. However, Alfred's work had nothing to do with Shi Zhou. The only connection is that they were all Chinese.

62. Employees frequently outcast Plaintiffs and one employee, Mark Jennings, would scream at Alfred, "Speak English!" since the inception of Alfred's employment.

63. Defendant John would ask Alfred, "Do you think all Asian women are crazy?" and other stereotyping and racial questions from the time he joined.

64. The next day, Defendant John indicated that Wilmington was instituting a new LTA form for clients to sign and additionally required that Plaintiffs provide a detailed trade log explaining their rationale behind every trade. This is the first time Plaintiffs were subject to this

level of monitoring. Also, Plaintiffs were not being paid for this work based on the way the Company paid salary. Defendant John also had access to everyone's real time trades on his system and had the ability to create a custom report for each account if he wanted to. Therefore this log seemed to be an effort to review Plaintiffs' trades and a transition document to terminate Plaintiffs. Again, no one else was asked to do a trade log except Plaintiffs. He also required Plaintiffs to print the trade log, sign and hand it in every day. This may also have been to avoid FINRA review of emails.

65. Since Defendant John started in the NYC branch, he had been inquiring with Plaintiffs about trade strategy as he was obviously trying to learn and fill his gap of knowledge and lack of sophistication with discretionary/high risk accounts.

66. However, Defendant John did not respect Eddie and refused to speak to him as an equal or respected co-worker. Therefore, Defendant John came directly to Alfred and looked for opportunities to ask him questions directly when Eddie was not present. However, Alfred was clearly much more junior so Defendant John was trying to get Eddie's know-how without the respect and decency to speak to him directly.

67. After Defendant John took over the NYC branch, Defendant Dorushkin claimed that Plaintiffs' accounts were not approved by the company, without any explanation. Defendants never sought a better understanding and never contacted Plaintiffs directly or through the CCO about the account status or trading strategies. Plaintiffs only continued account opening, discretionary and trading strategies as approved by their prior supervisor Michael Halperin. Defendants were suspicious of Plaintiffs as Chinese males and stereotyped them due to their race/national origin and refused to evaluate Plaintiffs based on their substantive performance.

68. On May 31, 2018, Plaintiffs met with a high profile prospect at 4 pm. Although Defendant John knew where Plaintiffs were, he set up a branch meeting at 4:15 pm in a clear effort to create a conflict for Plaintiffs. Defendant John kept calling and texting Plaintiffs as to their whereabouts. Again, based on how Wilmington paid "salary," Plaintiffs do not get

compensated for these meetings and only based on client account generation. Plaintiffs were successful in business development and the prospective client committed a large amount of capital to their trading strategy.

69. The next day, on June 1, 2018, Alfred was called into Defendant John's office and forced to resign. Defendant John said that "today will be your last day" and that Alfred was only allowed to close positions on his account. Then Eddie was called into Defendant John's office and forced to resign.

70. At the time of his termination, Alfred had no customer complaints, no disciplinary action (whether internal or external) and had no loss in the accounts he worked on.

71. Like Eddie, Alfred was given an ultimatum to resign or suffer career consequences. Being much more junior and a foreign national, Alfred was very afraid and submitted the letter of resignation (although he was terminated).

72. Alfred was forced to resign on the same day as Eddie.

73. Alfred lost access to the office, work email and logins to client accounts on June 1, 2018. On June 4, 2018, Alfred was told by Defendant John to hand in a hard copy of a resignation letter. He said an emailed copy would not be accepted. At this point, it was clear to Alfred that Defendants did not want a regulator to see the chain of events. As Alfred appropriately felt this might damage him or his clients, Alfred did email the CEO Defendant Dorushkin to have a record of the events.

74. Upon information and belief, when White brokers such as Tom Lisa were terminated, they were treated with much more respect.

75. On June 5, 2018, Alfred's client Siyi Zhao sent an email regarding account status and no one at Wilmington responded. Clearly, Wilmington wanted Chinese business but disrespected both Chinese clients and employees.

76. On June 8, 2018, Defendant Dorushkin responded to Alfred's email warning him of the potential consequences on the CRD registration (U-4/U-5) if he continued to pursue the matter.

## CAUSES OF ACTION
### FIRST CAUSE OF ACTION
### Race Discrimination in Violation of Title VII
### (All Plaintiffs against Defendant Wilmington Capital Securities, LLC)

77. Plaintiffs hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 76 with the same force as though separately alleged herein.

78. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000(e) et seq., for relief based upon the unlawful employment practices of the above-named Defendant.

79. Defendant was and is an employer within the meaning of Title VII.

80. At all times relevant to this case, Plaintiffs were and are Asian male employees and are members of protected classes within the meaning of Title VII.

81. At all times, Defendant was aware of Plaintiffs' race and national origin.

82. Defendant engaged in unlawful employment practices prohibited by Title VII because of Plaintiffs' race in the manner described in the Statement of Facts.

83. Ultimately Defendant terminated Plaintiffs due to their race and/or national origin.

84. As a direct and proximate result of Defendant's unlawful and willful conduct, Plaintiffs have suffered and will continue to suffer the loss of income, loss of salary, and continued advancement in their career.  Plaintiffs will also have suffered future pecuniary losses, attorney's fees and costs, emotional pain and suffering, inconvenience and other non-pecuniary losses.

85. As a further direct and proximate result of Defendant's unlawful and willful conduct, Plaintiffs have suffered and will continue to suffer, among other items, impairment and damage to Plaintiffs' good name and reputation, emotional distress, mental anguish and lasting embarrassment and humiliation.

86. Plaintiffs are entitled to recover monetary damages and other damages and relief, including, but not limited to back pay, front pay, punitive damages, reasonable attorney's fees, emotional distress damages and compensatory damages from Defendants under Title VII.

## SECOND CAUSE OF ACTION
### Hostile Work Environment and Wrongful Termination in Violation of Section 1981
### (All Plaintiffs against All Defendants)

87. Plaintiffs hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 86 with the same force as though separately alleged herein.

88. Section 1981 prohibits employers from discriminating against employees on the basis of race.

89. Defendants discriminated against Plaintiffs by subjecting them to hostile, discriminatory treatment and offensive, racially motivated comments and actions. Defendants discriminated against Plaintiffs by promoting White and/or lesser-qualified employees over Plaintiffs and subsequently terminating Plaintiffs with no legitimate reason.

90. Defendants unlawfully terminated Plaintiffs because of their race.

91. As a direct and proximate consequence of Defendants' race discrimination, Plaintiffs have suffered, and continue to suffer, substantial economic damages, including, but not limited to, back pay and front pay, as well as emotional distress and suffering, all in amounts to be determined at trial.

92. Defendants' discriminatory treatment of Plaintiffs was willful and in reckless disregard of Plaintiffs' federally protected rights. Accordingly, Plaintiffs are entitled to an award of punitive damages against Defendants.

## THIRD CAUSE OF ACTION
### Race Discrimination in Violation of NYSHRL
### (All Plaintiffs against All Defendants)

93. Plaintiffs hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 92 with the same force as though separately alleged herein.

94. This claim is brought under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 et seq., and reference is made to the NYSHRL in its entirety.

95. At all relevant times, Defendants were and are employers within the meaning of the NYSHRL.

96. At all relevant times, Plaintiffs were and are employees within the meaning of the NYSHRL.

97. At all times relevant to this case, Plaintiffs were and are Asian male employees and are members of protected classes within the meaning of NYSHRL.

98. At all times, Defendants were aware of Plaintiffs' race and national origin.

99. Defendant engaged in unlawful employment practices prohibited by NYSHRL because of Plaintiffs' race in the manner described in the Statement of Facts.

100. Ultimately Defendants terminated Plaintiffs due to their race and/or national origin.

101. Defendants' conduct, as alleged herein, constitutes unlawful discriminatory practices and unlawful discrimination on the basis of race and national origin, as defined by the NYSHRL, by engaging in, causing, perpetrating, committing, authorizing, directing, participating in, aiding, abetting, inciting, compelling and/or coercing the unlawful conduct alleged herein, or attempting to do so, in violation of the NYSHRL.

102. Defendants are also individually and jointly liable for the unlawful conduct herein, including without limitation as an "employer" under the NYSHRL and under the "aiding and abetting" provision of the NYSHRL. See, e,g., NYSHRL § 296(1) and § 296(6).

103. Plaintiffs hereby make a claim against Defendants under all of the applicable paragraphs of Executive Law Section 296.

104. Plaintiffs' damages include financial loss, loss of employment opportunities, damage to their career and professional reputation, and severe emotional distress caused by the degrading conduct and loss of employment opportunities.

105. Plaintiffs are entitled to recover monetary damages and other damages and relief, including, but not limited to back pay, front pay, and compensatory damages from Defendants under the NYSHRL.

## FOURTH CAUSE OF ACTION
### Race Discrimination in Violation of NYCHRL
### (All Plaintiffs against All Defendants)

106. Plaintiffs hereby reallege and incorporate each and every allegation contained in paragraphs 1 through 105 with the same force as though separately alleged herein.

107. This Count is brought under the NYCHRL, N.Y.C. Admin. Code § 8-101 et seq., and reference is made to the NYCHRL in its entirety.

108. At all relevant times, Defendants were and are employers and persons within the meaning of the NYCHRL.

109. At all relevant times herein, Plaintiffs were and are employees and persons within the meaning of the NYCHRL.

110. At all times relevant to this case, Plaintiffs were and are Asian men and are members of protected classes within the meaning of NYCHRL.

111. At all times, Defendants were aware of Plaintiffs' race and national origin.

112. Defendants engaged in unlawful employment practices prohibited by NYCHRL because of Plaintiffs' race and national origin in the manner described in the Statement of Facts.

113. Defendants engaged in, caused, perpetrated, committed, authorized, directed, participated in, aided, abetted, incited, compelled and/or coerced the unlawful conduct alleged herein, or attempted to do so, in violation of the NYCHRL.

114. Defendants' conduct, as alleged herein, were carried out with malice or reckless disregard for Plaintiffs' protected rights to be free from discrimination.

115. Defendants are individually and jointly liable for the unlawful conduct herein, including without limitation as an "employer" and "employee" under the NYCHRL and under the "aiding and abetting" provision of the NYCHRL. See, e.g., NYCHRL § 8-107(1) and § 8-107(6).

116. As a direct and proximate result of Defendants' unlawful and willful conduct, Plaintiffs have suffered and continue to suffer injury, with resulting monetary, economic and

other damages, including without limitation: (i) lost wages; (ii) lost back pay; (iii) lost benefits; (iv) lost interest; (v) lost bonuses; and (vi) attorney's fees and costs.

117. As a further direct and proximate result of Defendants' unlawful and willful conduct, Plaintiffs have suffered and continue to suffer, among other items, impairment and damage to Plaintiffs' good name and reputation, emotional distress, mental anguish, emotional pain and suffering, and lasting embarrassment and humiliation.

118. Plaintiffs are entitled to recover monetary damages and other damages and relief, including punitive damages, interest, and attorney's fees and costs from Defendants under the NYCHRL.

### REQUESTS FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the following relief:

A. Issue a declaratory judgment declaring that the actions of the Defendants, as set forth in this Complaint, violated Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. §1981; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law. § 290 et seq.; and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq.;

B. Enjoin and restrain the Defendants and all persons acting on their behalf, or in concert with them, from engaging in such unlawful discriminatory and retaliatory practices;

C. Reinstatement of Plaintiffs' employment;

D. Enter judgment in favor of the Plaintiffs, and against the Defendants, for back pay, front pay, and lost benefits in the amount of the wages it is determined that the Plaintiffs lost as a result of the Defendants' unlawful and discriminatory conduct, together with interest;

E. Enter judgment in favor of the Plaintiffs, and against the Defendants for compensatory damages, including but not limited to, damages for Plaintiffs' mental anguish, humiliation, lack of self-respect, and pain and suffering, together with interest;

F.       Award the Plaintiffs punitive damages;

G.       Award the Plaintiffs reasonable attorney's fees, together with the costs of this action;

H.       Award such other and further legal and equitable relief as may be appropriate to redress fully the deprivation of the Plaintiffs' rights under the laws cited herein, to prevent their recurrence in the future and to protect other employees from such unlawful behavior; and

I.       Such other and further relief as the court deems appropriate to be determined at trial.

Dated:       New York, New York
                April 25, 2019

                                   By:    <u>s/ Tiffany Ma</u>
                                                   Tiffany Ma
                                                   Young & Ma LLP
                                                   575 Lexington Avenue, 4th Floor
                                                   New York, NY 10022
                                                   (212) 971-9773
                                                   tma@youngandma.com

                                                   *Attorneys for Plaintiffs Edward Wong and Keren Zhou*